Filed 5/11/22  P. v. Lopez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSEPH ENRIQUE LOPEZ,<br><br>    Defendant and Appellant. | F082072<br><br>(Fresno Super. Ct. No. F06906977)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Gary R. Orozco, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Hill, P. J., Levy, J. and Poochigian, J.

## INTRODUCTION

In 2008, appellant Joseph Enrique Lopez (appellant) was convicted after a jury trial of count 1, first degree murder, with two special circumstances: the murder was intentional and committed while appellant was an active participant in a criminal street gang (Pen. Code, § 190.2, subd. (a)(22));[1] and the murder was committed by appellant while the defendants were engaged in the commission of rape (§ 190.2, subd. (a)(17)).

In 2020, appellant filed a petition for resentencing pursuant to section 1170.95, and asserted he was not the actual killer, he was convicted under the felony-murder rule, and/or the natural and probable consequences doctrine, and he could not be now convicted of first or second degree murder because of the amendments to sections 188 and 189. The court denied the petition.

On appeal, his appellate counsel has filed a brief which summarizes the facts with citations to the record, raises no issues, and asks this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436.) We affirm.

## FACTS[2]

On June 12, 2006, police were called to a tow yard in Fresno where the body of 16-year-old Courtney Rice was discovered in the bed of a pickup truck. The decomposing body was found lying face down, wrapped in a sleeping bag, plastic trash bags, and other materials. Rice's feet were handcuffed together, and her hands were handcuffed behind her back. Her pants were lowered, exposing her buttocks. There was black electrical

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

[2] The factual summary is taken from this court's opinion that affirmed appellant's conviction on direct appeal, that was relied on in appellant's petition, the People's opposition, and appellant's opening brief. We have taken judicial notice of this court's records and nonpublished opinion in *People v. Lopez* (May 3, 2010, F056776), without objection from the parties. We recite these facts to provide context for the court's ruling and the parties' arguments. As will be explained below, we do not rely on this factual summary in resolving the issues presented in this appeal. (See § 1170.95, subd. (d)(3).)

2.

tape tangled in her hair. The chief pathologist of the county coroner's office opined the cause of death was "probable asphyxiation" caused by "binding and gagging."

The subsequent murder investigation uncovered evidence connecting Rice to the defendants, and placing them together during a period between Friday, June 9, and Sunday, June 11, 2006. At trial, the parties stipulated that all the defendants were active members of the Bulldog criminal street gang.

Two other individuals, Sylvester Carter and Maria Coronado, were also linked to the victim. The prosecution's case against the defendants pivoted on the testimony of these two percipient witnesses, who testified pursuant to plea bargains entered on related charges. At trial, Carter admitted he was a member of the Northside Crips, a criminal street gang. Coronado testified she used to associate with the Bulldog gang when she was a teenager and had since had her gang tattoos surgically removed.

Carter testified he went to Michelle Molina's apartment on Friday, June 9, 2006, to use drugs; i.e., crack cocaine. When he arrived in the late afternoon, the door to Molina's apartment was partly open. He walked inside and was met by appellant and Molina who told him he "might not want to be here right now, we doing something serious." Thinking they were trying to "party" without them, Carter said, "[S]top playing" and pushed them aside. He then saw Rice lying on the floor in the middle of the hallway. Her hands were handcuffed behind her back and her feet were handcuffed. She was gagged and black electrical tape was wrapped tightly and painfully across her eyes and around her head.

Appellant told Carter, "[C]alm down, this was all right." Appellant explained that Rice had been "running her mouth." Carter understood this to mean Rice had been "snitching" or "talking about [appellant's] … illegal activities." Appellant asked Carter to kick Rice or do something to show he was "down with the situation." Carter kicked Rice in the small of the back and appellant said, "That's what I'm talking about."

Carter testified that at the time he went to Molina's apartment, he believed appellant, Molina, and Vargas were members of the Bulldog gang. After appellant explained the situation, Carter understood that Rice had been snitching about appellant and that serious things were happening as a result. The environment in the apartment seemed dangerous. Carter agreed that, by testifying at trial, he was also being a snitch and that this placed him in danger in prison. According to Carter, gangs, including the Bulldogs and Northside Crips, had a "green light" on snitches. A snitch's status was worse than that of a rapist or child molester.

After kicking the victim in the hallway, Carter went to join Vargas in the living room, where they got high on crack cocaine appellant gave them. At some point, appellant told Carter and Vargas to "[f**]k [Rice] in the ass" and added that she liked it like that and deserved it. Carter said he would not touch Rice because she was "dirty." Carter explained that "she wasn't in good hygiene care at the time," and her clothes "didn't look too clean."

After Carter made these observations regarding the victim's physical appearance, appellant and Molina ordered Rice to "scoot on her backside towards the bathroom." During this time, Molina acted aggressively towards Rice, calling the victim bad names, making derogatory statements about her appearance, and deriding her for believing she was "going to be with" appellant. In the bathroom, Molina used a key to remove the handcuffs from Rice's hands and feet. Molina then undressed Rice and directed her to sit in the bathtub where she doused Rice with water and shampoo for approximately 10 to 15 minutes.

Afterwards, Molina put the handcuffs back on Rice, who was now naked, and ordered her to scoot back out of the bathroom. Tired of seeing Rice "scooting", Carter picked Rice up by the arms and dragged her into the back bedroom, where he left her on the floor.

According to Carter's testimony, Molina gave condoms to him and Vargas, and appellant gave them crack cocaine. Carter and Vargas then went into the bathroom to toss a coin to determine who would have sex with Rice first. Carter won the coin toss but told Vargas to go first because he was having difficulty achieving an erection due to his heavy crack cocaine use. Carter remained in the bathroom and tried to get an erection by masturbating. A little later, Carter saw Vargas, shirtless and sweaty, emerge from the back bedroom and walk down the hall towards the living room.

When Carter went into the back bedroom, he found Rice on her knees and elbows with her buttocks up in the air. She was no longer handcuffed, but the tape was still around her eyes. Carter tried but was unable to have sex with the victim due to his continuing lack of an erection. Carter told the victim, if asked, to lie and say they had sex because he was afraid of how the others might react if they found out he did not do his "part of the deal."

Coronado testified that throughout the night she saw the four men going back and forth to the back bedroom and heard them saying things like, "Are you ready, is she ready?" At one point, Alley and appellant were in the back bedroom together. She heard appellant laughing and one of them say, "This is how real gangsters get down."

Carter testified that after he left the back bedroom, he encountered Molina in the hallway. Molina had the key to the handcuffs and instructed Carter to put the handcuffs back on Rice. Carter also handed Molina a condom, which she went and disposed of in the kitchen. A little later, Molina announced: "You guys had your turn, now it's mine." She then walked into the back bedroom and closed the door.

Carter heard Molina yelling at Rice, calling her "a bunch of bitches," and saying "[Appellant] wasn't going to be with her at that time." In response, Rice was "yelling out submissive terms." Carter explained: "[Molina] would yell out, let's say, 'Do you believe [appellant] is gonna be with you?' [¶] And you will hear [Rice] say, 'no.' [¶] 'Are you a fat bitch?' [¶] You hear [Rice], say, 'yes.' "

Carter further testified that it also sounded like Rice was getting hit or kicked. Molina was in the bedroom with Rice for at least an hour. Periodically she would come out of the room looking "exhausted, … like she needed a break, catch her wind." She would rest for five or six minutes and then go back into the bedroom and shut the door.

Later, appellant and Carter went into the back bedroom with Rice. Appellant handed Carter a rock of cocaine and asked him what they should do with Rice. Carter said he did not know. Meanwhile, appellant used a pellet gun to shoot small, green rubber pellets at Rice, as she was lying handcuffed on the mattress. Rice would grunt when the pellets hit her. In her testimony, Coronado also described seeing appellant shoot Rice with the pellet gun and Rice flinch when the green pellets hit her.

Carter testified that around daybreak he went out on the balcony/stairwell with Molina and Coronado and smoked a cigarette. Before he went outside, he noticed the door to the back bedroom was open. When he came back into the apartment, the door was closed and he could hear muffled voices, which he recognized as belonging to appellant and Alley. Carter went back out to the balcony and saw that Molina, Coronado, and Vargas had left the apartment and gone downstairs to an area near the parking lot and below the windows of the back bedroom. Carter went to join them.

Carter heard the music that had been playing in the apartment suddenly get much louder. He then heard Rice yelling "help" and "no." He also heard a thumping sound that was rattling the windows, but which was not caused by the music. Molina, who was standing next to Carter, warned: "You better not run." But when Carter looked up and saw the maintenance man coming down the walkway, he panicked and ran away.

Coronado testified that earlier appellant had exited the back bedroom holding his shotgun and said, "This bitch is gonna have to die." Shortly after appellant made this statement, Coronado asked Alley permission to leave the apartment to go home to change out of her work clothes. Alley told her she would have to come back to the apartment afterwards. Although she had a cell phone, Coronado testified she was too scared to call

6.

911 or try to get help for Rice because Alley knew where she lived. After Coronado changed her clothes, she returned to Molina's apartment around 5:00 or 5:30 a.m. It was still dark outside. There were no sounds coming from the apartment. She saw Vargas lying on the couch, apparently asleep.

As Coronado walked to Molina's bedroom, she noticed the doorway to the back bedroom was open. Peering into the room, Coronado observed Rice lying face down on the floor. Rice's feet were handcuffed, and it looked like she was wearing clothes. Coronado did not see anyone else in the bedroom.

Once inside Molina's bedroom, Coronado smoked drugs with Molina, appellant, defendant, and Alley. Coronado was unsure where Carter was at this time. A little later, Coronado saw Carter walk down the hallway, go into the back bedroom, and close the door. Coronado heard some noises and it sounded like Carter had turned the music back on. Appellant then left Molina's bedroom and joined Carter in the back bedroom. This was around 7:00 a.m. Coronado heard the music get louder. She then saw Vargas get up from the couch in the living room and go into the back bedroom and close the door. Finally, Alley also got up and went into the back bedroom and closed the door, leaving Coronado and Molina alone in Molina's bedroom. Coronado heard the four men talking but could not make out what they were saying because of the music playing in the back bedroom.

Coronado started talking to Molina about trying to see if they could talk the guys into letting them leave the apartment. After this, they went outside to smoke a cigarette. About five minutes later, they came back into the apartment and went back into Molina's bedroom. The door of the back bedroom was still closed, and music was coming from the room. The door opened and all four men came out. Appellant and Alley told Molina and Coronado to keep an eye on Vargas and Carter and to make sure they did not leave. Molina, Coronado, and Carter sat in Molina's bedroom smoking drugs. Vargas returned

7.

to the living room couch. Appellant and Alley went into the back bedroom. The door was closed, and the music got a little bit louder.

Molina and Coronado went outside to smoke another cigarette. Coronado walked to the bottom of the stairs, and Molina stayed upstairs. A few minutes later, Carter came down the stairs, walked past Coronado, and left the apartment complex. Coronado never saw Carter again that morning.

Meanwhile, Coronado heard thumping sounds that were not the beat of the music. She assumed they were coming from the back bedroom. With each thump, the window from that room vibrated. She was not able to hear anything else at that time.

Coronado returned to the apartment. Appellant and Alley came out of the back bedroom and yelled at Coronado for letting Carter leave. Appellant, Molina, Alley, and Coronado then went into Molina's bedroom together. The four sat and talked about Carter. Appellant was upset and wanted to go look for him. The discussion lasted 10 or 15 minutes.

Appellant then left the apartment to look for Carter. Coronado sat in Molina's bedroom with Alley and Molina for another 20 minutes. Alley left and went into the back bedroom with Vargas and closed the door behind him. The music got a lot louder. Molina and Coronado went back outside the front door to smoke a cigarette. Coronado heard more thumping from the apartment and this time moaning and screaming like someone was in pain. The screaming went on for 15 or 20 minutes.

Coronado went downstairs. It was light by this time. She saw a maintenance man throwing some trash in the dumpster and a couple of neighbors sitting on the stairs smoking cigarettes. When she was at ground level in front of the two windows of Molina's apartment, she heard "screaming, thumping, like somebody was jumping up and down." The windows were rattling, and the volume of the music had been turned up a lot higher. At this point in time, she had not seen appellant return to the apartment. The only people in the apartment were Alley, Vargas, and Rice. Eventually, Alley came out

8.

of the apartment. He was sweaty, his face was red, and he complained of being hot. Alley said, "[S]he doesn't want to die" and "[N]o matter what they do, she's still breathing."

Alley asked Molina about appellant and then went back into the apartment. When Alley was on the balcony with Coronado, she only heard the music coming from the back bedroom and no thumping or screaming. When Alley went back into the apartment, the screaming and thumping started again. The screaming finally stopped, and the music was lowered. Vargas stayed in the room and Alley came back out and said something to Molina. After that, Alley said to Coronado that they needed to come up with a story to explain what they were doing that day.

In their testimony, Carter and Coronado went on to describe how the group later met at a motel and made efforts to hide Rice's body and other evidence of the crimes. It was decided that the "girls" (i.e., Molina and Coronado) would return to the apartment and clean up and that the "guys" would go over later and move the body. Coronado was not happy with this arrangement and argued with Alley about it. Eventually she and Molina returned to the apartment around 3:00 or 4:00 p.m., after first purchasing cleaning supplies at a discount store.

When they walked inside the apartment, there was an overwhelming stink. Molina and Coronado got upset and started crying. They then hugged each other and went into the back bedroom where Rice's body was lying on the floor. There was a green dishtowel over Rice's face. Her right arm was in a fist by her side and the other arm was twisted behind her back. She was wearing jeans, which were lowered, exposing the pubic area. Coronado rolled Rice over to clean the carpet underneath her body. Coronado and Molina also wiped down counters and doorknobs in the apartment.

Early the next morning, Coronado drove back to Molina's apartment and met up with the others. Appellant and another individual, named Craig Mills, were in the back bedroom trying to move a loveseat, which had Rice's body on it. Rice's body was

9.

wrapped in a sleeping bag and her feet were still cuffed. As the men were trying to move the loveseat, appellant seemed "happy." He said that "it was turning him on to see [Rice] like that" and "[t]hat he wanted to f[**]k her."

Rice's body fell off the loveseat and appellant dragged it into the living room. Appellant and Mills wrapped the body in a futon mattress and tied it with electrical cords. They then took the body downstairs and put it in the bed of a blue pickup truck, which belonged to the construction company where appellant's brother worked and was his brother's work vehicle.

The group drove in separate vehicles to a rural area of Fresno, stopping first at a gas station to fill a five-gallon can with gas, which appellant indicated he was planning to use to burn Rice's body. They eventually pulled into an almond orchard. Appellant, Vargas, and Mills retrieved shovels from the bed of the pickup truck and started to dig a hole. They had been digging five or 10 minutes, when Coronado saw a light in the distance and warned them that she thought someone was coming. They fled, abandoning the pickup truck containing Rice's body. The pickup was observed by a California Highway Patrol Officer on the morning of Sunday, June 11, 2006, and ordered towed to the impound lot where Rice's body was discovered the following day.

Amanda Essman, a resident of Molina's apartment complex, testified that in early June 2006, Rice described herself to Essman as appellant's "hooker" and a "gangster" and made statements to the effect that she and appellant had committed crimes ("done dirt") together. About 20 minutes after Rice made these statements, Essman confronted appellant. Appellant denied Rice's statements and told Essman that Rice was "crazy." Later, Rice called Essman a snitch and said she was going to kill her. Fearing for her personal safety, Essman spent the night at a hotel.

Another resident of the apartment complex, Terri Egger, testified that on Saturday, June 10, 2006, she overheard Molina arguing with appellant. Molina told appellant, "Don't you bring that bitch to my place, don't bring her over there," and "If I ever see

10.

that bitch again, I'm going to beat her ass." Appellant said something about using the person for prostitution and getting money for him by robbing people.

A few hours later, Egger met Rice for the first time by a trash dumpster at the apartment complex. Rice was not wearing any shoes and Egger invited her to her apartment to give her some clothing.

Later that evening, Molina told Egger that Rice was the person she had been arguing about with appellant earlier that day. Molina came to Egger's apartment around 9:00 or 10:00 p.m. Molina seemed nervous. She was limping and her knuckles were swollen and bruised. Egger asked Molina how she injured her hand. Molina responded that she was "made to fight some girl." As to the limp, Molina said the girl's head hit her foot, and she was going to have to get rid of her shoes.

Molina returned to Egger's apartment around midnight, seeming more "antsy" than before. Molina left some laundry at Egger's apartment and never returned for it.

Appellant's brother, Richard Juarez, testified that he knew his brother had several girlfriends. Juarez had met Rice in the past. The last time was about two weeks before she died. Appellant told Juarez that Rice "had stuff on him."

**The Gang Expert's Testimony**

As noted above, the parties stipulated that all defendants were active members of the Bulldog criminal street gang.

Detective Anthony Gates testified as the prosecution's gang expert, that the Bulldog gang is the largest gang in the greater Fresno area, with approximately 4,000 validated members. The Bulldog gang members identify with the color red and anything related to the Fresno State athletic department such as the school's bulldog mascot. The Bulldog gang's primary activities include murder, assaults, and witness intimidation.

Presented with a series of hypothetical scenarios based on the facts and circumstances in this case, Detective Gates opined, as to each defendant, that their activities benefited, were directed by, and were in association with the Bulldog gang.

11.

Among other things, Detective Gates testified that by acting in the presence of other Bulldog gang members, defendants' activities benefited the gang because "now each one of them can attest – or testify to the fact that that person is willing to commit such violent acts, again, garnishing the fear, garnishing the reputation."

It also benefited the gang when one of its members was successfully able to direct others, including non-Bulldog members, to assist him in carrying out his crimes. Thus, Detective Gates answered in the affirmative, when asked, "The individual who was using the 16-year-old, as a prostitute, did his actions in having that snitch raped and murdered, is that furthering the activities of the Bulldog gang." The gang expert explained: "[a]gain, you're talking about a group that thrives on fear and intimidation, and you get fear and intimidation by committing violent acts. And in that culture, the more fear and intimidation and respect you have, the easier it is to be a gang."

## PROCEDURAL BACKGROUND[3]

On January 7, 2008, a first amended information was filed that charged appellant Lopez and codefendants Rodger Alley Jr., Elbert Vargas, and Michele Molina with count 1, first degree premeditated murder. As to all defendants, there were two special circumstances alleged: (1) the murder was intentional, appellant was an active participant in a criminal street gang, and the murder was carried out to further the activities of the criminal street gang (§ 190.2, subd. (a)(22)); and (2) the murder was committed by appellant while he was engaged in, or an accomplice in, the commission of or attempted commission of, the crime of rape (§ 190.2, subd. (a)(17)(C)).

Appellant and the codefendants were also charged with count 2, forcible rape (§ 261, subd. (a)(2)), with the special allegation that they were engaged in tying or

---

[3] The following procedural background is based on the pleadings, minute orders, printed jury instructions, and verdict forms from appellant's jury trial contained in the instant appellate record, and the record and this court's opinion that affirmed his convictions and sentence on direct appeal. (§ 1170.95, subd. (d)(3).)

12.

binding the victim in the commission of the offense (§ 667.61, subd. (b)); count 3, attempted forcible rape (§§ 664, 261, subd. (a)(2)) with the tying/binding allegation (§ 667.61, subd. (b)); and count 4, false imprisonment by violence (§ 236). There were gang enhancements and prior conviction allegations.

**The Jury's Verdicts**

On February 21, 2008, after a joint trial for appellant Lopez and codefendants Molina, Alley, and Vargas, the jury reached the following verdicts.

Appellant was the only defendant convicted of count 1, first degree murder, and both special circumstances were found true: the murder was intentional and committed while appellant was an active participant in a criminal street gang; and the murder was committed during the commission or attempted commission of rape. The gang enhancement was also found true (§ 186.22, subd. (b)(1)(C)).

Appellant was found not guilty of count 2, forcible rape. He was convicted of count 3, attempted forcible rape, with the tying/binding allegation and gang enhancement found true; and count 4, false imprisonment by force, with the gang allegation.

As to count 1, codefendant Molina was found not guilty of murder but convicted of the lesser offense of involuntary manslaughter. The jury was unable to reach verdicts on count 1 as to codefendants Alley and Vargas.[4]

**Sentencing**

On December 19, 2008, the court sentenced appellant to life without the possibility of parole for count 1, first degree murder, with a consecutive determinate term of 11 years eight months as follows: the upper term of four years for count 3 and five years for the attached gang enhancement; eight months for count 4 plus one year for the

---

[4] As to the other counts, both Molina and Vargas were found not guilty of count 2, forcible rape; and guilty of count 3, attempted forcible rape, and count 4, false imprisonment by violence. Alley was found not guilty of counts 2 and 3, and the jury was unable to reach a verdict on count 4.

attached gang enhancement (one third the midterms); and one year for a prior prison term enhancement (§ 667.5, subd. (b)).

**Appellant's Direct Appeal**

On May 3, 2010, this court filed the nonpublished opinion that affirmed appellant's convictions and sentence. (*People v. Lopez, supra*, F056776.) We rejected his argument that the trial court abused its discretion in denying his posttrial motion for disclosure of confidential juror identifying information.

We also rejected his argument that the jury instructions were confusing and violated his due process and fair trial rights. Appellant did not dispute "that the instructions given in this case correctly stated the law," but he claimed that this was a complex case with multiple defendants and theories of liability, so that the instructions "should have included some type of 'roadmap' explaining 'the relationship between legal theories of murder, malice and felony murder,' 'why felony murder is both a legal theory of murder and a form of derivative liability,' 'why aiding and abetting and conspiracy are distinct forms of derivative liability,' 'why aiding and abetting and conspiracy apply not only to derivative liability but also evidentiary determinations,' " and argued that without some guidance, " 'the lay jury in this case – and, indeed, in any complex case – has no roadmap to guide the jurors. The jurors cannot reach a verdict on sound legal grounds.' "

This court held appellant cited no authority for his assertion that in a complex criminal case the trial court is required to provide a roadmap or overview explaining the rationale behind particular jury instructions or the relationship between theories of liability and rules of evidence set forth in the instructions, and we presumed the jurors were intelligent and capable of understanding and correlating all jury instructions given, and that they followed those instructions. We further held appellant failed to demonstrate the instructions were so confusing that they violated his due process and fair trial rights, and there was no reasonable likelihood that the jury applied the challenged instructions in a way that violated his constitutional rights:

14.

"As the People note, there was no evidence of jury confusion with respect to the charges against appellant. Just before the verdicts were read, the trial court received a note that the jury was unable to reach verdicts on all counts as to two of the defendants. When the court brought the jury in and asked whether there was anything the court could do to assist the jury in reaching verdicts, Juror No. 12 expressed that he thought some of the instructions were 'a little confusing' and 'conflicting one another.' After the court explained it could not change the instructions, Juror No. 12 agreed with the other jurors that there was nothing more the court could do to help resolve their deadlock. The court then collected the verdict forms and read the verdicts, which revealed the jury had been unable to reach verdicts with respect to defendants Alley and Vargas on the murder count. After reading the verdicts, the court polled the jurors, and each juror individually affirmed that the verdicts were his or her own.

"It is clear from the timing of his statements that any confusion exhibited by Juror No. 12 arose in the context of the jury's deliberations on the murder count with respect to Alley and Vargas, and that the jury had already completed its deliberations with respect to appellant and defendant Molina. There is no indication the jury was confused or misapplied any of the instructions as to appellant."

We also rejected appellant's claim that since he was the only person convicted of murder, "even though the evidence indicated he was not in the apartment at the precise time of Rice's death, [that] somehow demonstrates the jury was confused by the instructions. In view of the fact appellant does not challenge the sufficiency of the evidence supporting his [murder] conviction, and that the jury was correctly instructed on the various theories under which it could find appellant guilty of Rice's murder, we find no evidence of confusion in the jury's verdict."

Finally, we rejected appellant's assertion there was insufficient evidence to support the gang enhancements and gang special circumstance.

"The gang special circumstance required proof appellant 'intentionally killed' … Rice while he was 'an active participant in a criminal street gang … and the murder was carried out to further the activities of the … gang.' (§ 190.2, subd. (a)(22).) The gang enhancements required proof appellant's crimes were committed 'for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang

15.

members[.]'  (§ 186.22, subd. (b)(1).)  [¶]  As noted above, the parties stipulated the defendants were all active members of the Bulldogs criminal street gang."

## SENATE BILL NOS. 1437 & 775

The instant appeal is from the denial of appellant's petition for resentencing of his murder conviction filed pursuant to Senate Bill No. 1437 (2017–2018 Reg. Sess. (Senate Bill 1437)).

Senate Bill 1437 became effective on January 1, 2019, and amended " 'the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)

"Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723; *People v. Gentile* (2020) 10 Cal.5th 830, 842.)[5]

"In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill 1437 added section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis, supra*, 11 Cal.5th at p. 959.)

"Pursuant to section 1170.95, an offender must file a petition in the sentencing court averring that:  '(1) A complaint, information, or indictment was filed against the

---

[5] As amended, section 189, subdivision (f) states an exception that allows "individuals to be convicted of felony murder even if they did not act with malice and do not fall in one of the three categories of section 189, subdivision (e), where the victim is a peace officer engaged in the course of his or her duties and the defendant knows (or reasonably should know) these facts." (*People v. Hernandez* (2021) 60 Cal.App.5th 94, 99.)

petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to section 188 or 189 made effective January 1, 2019.' [Citations.] Additionally, the petition shall state '[w]hether the petitioner requests the appointment of counsel.' [Citation.] If a petition fails to comply with subdivision (b)(1), 'the court may deny the petition without prejudice to the filing of another petition.' " (*Lewis, supra*, 11 Cal.5th at pp. 959–960.)

"Where the petition complies with [section 1170.95,] subdivision (b)'s three requirements, then the court proceeds to subdivision (c) to assess whether the petitioner has made 'a prima facie showing' for relief. [Citation.] [¶] If the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not … previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' [Citation.] 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' [Citation.] At the hearing stage, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' " (*Lewis, supra*, 11 Cal.5th at p. 960.)

**Lewis**

In *Lewis*, the court interpreted the provisions of section 1170.95 and held that petitioners "are entitled to the appointment of counsel upon the filing of a facially sufficient petition [citation] and that only *after* the appointment of counsel and the opportunity for briefing may the superior court consider the record of conviction to

17.

determine whether 'the petitioner makes a prima facie showing that he or she is entitled to relief.' " (*Lewis, supra*, 11 Cal.5th at p. 957.) " 'If the petitioner has requested counsel, the court *shall* appoint counsel to represent the petitioner.' " (*Id*. at p. 963, italics added in original.)

*Lewis* also held that "at the prima facie stage, a petitioner's allegations should be accepted as true, and the court should not make credibility determinations or engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis, supra,* 11 Cal.5th at p. 974.) When the court conducts the prima facie determination, section 1170.95, subdivision (b)(2) only permits screening out "noncomplying petitions, not petitions that lack substantive merit." (*Lewis,* at p. 968.)

*Lewis* further held that after appointing counsel, the trial court may rely on the record of conviction to determine whether the prima facie showing has been made in order "to distinguish petitions with potential merit from those that are clearly meritless." (*Lewis, supra*, 11 Cal.5th at p. 971.) "While the trial court may look at the record of conviction after the appointment of counsel to determine whether a petitioner has made a prima facie case for section 1170.95 relief, the prima facie inquiry under subdivision (c) is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' " (*Ibid*.)

" 'However, if the record, *including the court's own documents*, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Lewis, supra*, 11 Cal.5th at p. 971, italics added.)

"Appellate opinions … are generally considered to be part of the record of conviction. [Citation.] However, as we cautioned in [*People v. Woodell* (1998) 17 Cal.4th 448, 457], the probative value of an appellate opinion is case specific, and 'it is

certainly correct that an appellate opinion might not supply all answers.' [Citation.] In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' [Citation.] As the People emphasize, the 'prima facie bar was intentionally and correctly set very low.' " (*Lewis, supra*, 11 Cal.5th at p. 972.)

"[T]here is no categorical bar to consulting the record of conviction at the prima facie stage." (*Lewis, supra*, 11 Cal.5th at p. 972, fn. 6.) "In sum, the parties can, and should, use the record of conviction to aid the trial court in reliably assessing whether a petitioner has made a prima facie case for relief under [section 1170.95,] subdivision (c)." (*Id.* at p. 972, fn. omitted.)

The prima facie determination is a question of law, and the court may deny a petition at the prima facie stage if the petitioner is ineligible for resentencing as a matter of law. (*Lewis, supra*, 11 Cal.5th at p. 966.)

*Lewis* announced a prejudicial error standard under *People v. Watson* (1956) 46 Cal.2d 818, if the court failed to appoint counsel or violated the petitioner's statutory rights under section 1170.95, and the petitioner must "therefore 'demonstrate there is a reasonable probability that in the absence of the error he [or she] … would have obtained a more favorable result.' [Citations.]" (*Lewis, supra*, 11 Cal.5th at p. 974.)

Therefore, to demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his or her petition would not have been summarily denied without an evidentiary hearing. (*Lewis, supra*, 11 Cal.5th at pp. 972–974; see *People v. Watson, supra*, 46 Cal.2d at p. 836.)

**Senate Bill No. 775**

In October 2021, Senate Bill No. 775 was enacted and amended section 1170.95, effective on January 1, 2022. (2020–2021 Reg. Sess.; Stats. 2021, ch. 551, § 1 (Senate Bill 775).) As a result of the amendments, section 1170.95 clarified that "persons

19.

convicted of felony murder or murder under the natural and probable consequences doctrine *or other theory under which malice is imputed to a person based solely on that person's participation in a crime*, attempted murder under the natural and probable consequences doctrine, or manslaughter," may file a petition to have that conviction vacated under certain circumstances. (§ 1170.95, subd. (a), italics added.)

The amendments also codified the holding in *Lewis* that "[u]pon receiving a petition in which the information required by this subdivision is set forth …, if the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner." (§ 1170.95, subd. (b)(3).) After the petition is filed, the People shall file a response and the petitioner may serve a reply. (*Id*. at subd. (c).)

After the parties have the opportunity to submit briefs, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (§ 1170.95, subd. (c).) If the petitioner makes the prima facie showing, "the court shall issue an order to show cause." (*Ibid*.) If the court declines to issue an order to show cause, "it shall provide a statement fully setting forth its reasons for doing so." (*Ibid*.)

If an order to show cause is issued, "the court shall hold a hearing to determine" whether to vacate the petitioner's conviction, recall the sentence, and resentence petitioner. (§ 1170.95, subd. (d)(1).) At the hearing, the prosecution has the burden to prove beyond a reasonable doubt that petitioner is guilty of murder or attempted murder under the amended versions of sections 188 and 189. (*Id*. at subd. (d)(3).)

"At the hearing to determine whether the petitioner is entitled to relief … [t]he admission of evidence in the hearing shall be governed by the Evidence Code, except that the court *may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion*. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be

20.

excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder … is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3), as amended by Stats. 2021, ch. 551, § 2, eff. Jan. 1, 2022, italics added.)

## APPELLANT'S SECTION 1170.95 PETITION

On August 10, 2020, appellant filed, in pro. per., a petition for resentencing pursuant to section 1170.95, and requested appointment of counsel. Appellant adopted the factual and procedural history of the case from this court's opinion on direct appeal, included a copy of the opinion as a supporting exhibit, and stated that he would incorporate additional facts from the trial record as relevant to his petition.

The petition asserted the record showed "both first degree felony murder and murder under a natural and probable consequences theory were argued before [the] jury, and that the jury expressed confusion as to the instructions. Specifically, the jury was instructed on three types of derivative liability for murder, rape, and attempted rape: (1) aiding and abetting liability; (2) conspiracy liability; and (3) felony-murder liability. Within the category of felony-murder liability, the jury was instructed on personal liability, derivative liability as an aider and abettor or conspirator, and derivative liability as [an] aider and abettor or conspirator based on natural and probable consequences. The confusing nature of these aiding and abetting instructions was brought to the court's attention by the jury, but the court offered no enlightenment. As such, a prima facie case exists such as to entitle petitioner to be resentenced pursuant to the provisions of … section 1170.95."

Appellant filed a supporting declaration that he was convicted of first degree murder pursuant to the felony-murder rule and/or the natural and probable consequences doctrine; he could not be now convicted of first or second degree murder because of the

21.

amendments to sections 188 and 189 since he was not the actual killer; he did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of murder; and he was not a major participant who acted with reckless indifference to human life.

**The People's Opposition**

On September 15, 2020, the People filed opposition, also based on the factual statement from this court's opinion on direct appeal, with a copy of the opinion as a supporting exhibit. The People argued the court could rely on this court's prior opinion to make the prima facie determination.

The People asserted that while the jury was instructed on felony murder and the natural and probable consequences doctrine, appellant failed to make a prima facie showing for relief under section 1170.95 as a matter of law because the jury found true the gang special circumstance under section 190.2, subdivision (a)(22), that appellant intentionally killed the victim while he was an active participant in a criminal street gang.

**The Court's Denial of the Petition**

The superior court did not grant appellant's request to appoint counsel, invite further briefing, or conduct a hearing on the petition.

On October 22, 2020, the court filed an order that dismissed the petition with prejudice based on the record of conviction, because he failed to make a prima facie case and was ineligible as a matter of law. "The gang special circumstance required proof petitioner 'intentionally killed' the victim. Although likely the actual killer, at a minimum the petitioner did, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of murder in the first degree."

On November 19, 2020, appellant filed a timely notice of appeal.

## DISCUSSION

As noted above, appellant's counsel filed a *Wende* brief with this court. The brief also includes the declaration of appellate counsel indicating that appellant was advised he

could file his own brief with this court. By letter on April 9, 2021, we invited appellant to submit additional briefing. He did not do so.

Appellant's petition was filed and denied before the decision in *Lewis* and Senate Bill 775's amendments to section 1170.95, but the amended statute applies since appellant's case is not yet final. The court gave a statement of reasons for why it did not issue an order to show cause, but it did not grant appellant's request to appoint counsel, invite further briefing on the matter, or conduct a hearing on the prima facie issue, and it may have engaged in premature factfinding at the prima facie stage. (§ 1170.95, subd. (c).)[6] We may affirm the denial of the petition if appellant was not prejudiced by the statutory errors in this case. (*Lewis, supra*, 11 Cal.5th at pp. 972–974.)

To demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent the statutory error, his petition would not have been summarily denied without an evidentiary hearing. (*Lewis, supra*, 11 Cal.5th at pp. 972–974; *People v. Watson, supra,* 46 Cal.2d at p. 836.) The prima facie determination is a question of law, and the court may deny a petition at the prima facie stage if the petitioner is ineligible for resentencing as a matter of law. (*Lewis, supra*, 11 Cal.5th at p. 966.)[7] A section 1170.95

---

[6] The opinion from appellant's direct appeal is part of the record of conviction that may be considered to determine whether the petitioner has made a prima facie showing of resentencing eligibility. (*Lewis, supra*, 11 Cal.5th at p. 972.) However, the role of the appellate opinion is circumscribed. The factual summary contained in an appellate opinion is not considered admissible evidence regarding a petitioner's resentencing eligibility (§ 1170.95, subd. (d)(3)), and the court may not engage in factfinding based on the appellate opinion at the prima facie stage (*Lewis,* at p. 972).

[7] The court may rely on jury instructions, which are part of the record of conviction, to make the prima facie determination because the instructions "given at a petitioner's trial may provide 'readily ascertainable facts from the record' that refute the petitioner's showing, and reliance on them to make the eligibility or entitlement determinations may not amount to 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1055, disapproved on another ground in *Lewis*, *supra*, 11 Cal.5th 952.

petition is properly denied if the jury made a true finding on a special circumstance that renders the petitioner ineligible for relief. (*People v. Fayed* (2020) 9 Cal.5th 147, 201–202; *People v. Nunez* (2020) 57 Cal.App.5th 78, 90–91; *People v. Allison* (2020) 55 Cal.App.5th 449, 457–458.)

We find any statutory error is not prejudicial because the jury found true the gang special circumstance under section 190.2, subdivision (a)(22) – that "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang … and the murder was carried out to further the activities of the criminal street gang." The jury was instructed that to find the gang special circumstance true, the People had to prove appellant "intentionally killed" the victim, he was an active participant in a criminal street gang, and the murder was carried out to further the activities of the gang. Accordingly, defendant is ineligible for relief under section 1170.95 as a matter of law because the gang special circumstance requires "that the defendant intentionally killed the victim [citations], and the court would be correct to summarily deny a petition in such a case because the defendant could not make a prima facie claim that he was entitled to relief." (*People v. Allison*, *supra*, 55 Cal.App.5th at p. 460.)

The jury also found true the felony-murder-rape special circumstance. The jury was instructed that if it found appellant guilty of first degree murder, and he was not the actual killer, it must consider the special circumstance of felony murder/rape and decide whether he "acted either with intent to kill or reckless indifference to human life." In order to prove this special circumstance for a defendant who is not the actual killer but who is guilty of first degree murder as an aider and abettor or member of a conspiracy, the People must prove either that defendant intended to kill, or that he was "a major participant in the crime," and he "acted with reckless indifference to human life." The jury was thus required to find he acted "with reckless indifference to human life and as a major participant" in aiding or abetting the commission of the underlying felony.

24.

(§ 190.2, subd. (d); *People v. Gutierrez-Salazar* (2019) 38 Cal.App.5th 411, 419.)  In other words, "[t]he language of the special circumstance tracks the language of Senate Bill 1437 and the new felony-murder statutes." (*Gutierrez-Salazar*, at p. 419.)  A panel of this court has recently resolved to follow the line of authority holding that a felony-murder special circumstance finding precludes relief as a matter of law.  (*People v. Simmons* (2021) 65 Cal.App.5th 739, 748–749, review granted Sept. 1, 2021, S270048.)  We agree.

After independent review of the record, we find that no reasonably arguable factual or legal issues exist.

## **DISPOSITION**

The judgment is affirmed.